BANKERS TRUST COMPANY, complainant,

*v.*

BANK OF ROCKVILLE CENTER TRUST COMPANY, &c., et al., defendants.

[Decided March 21st, 1932.]

*Mr. W. Lindley Jeffers,* for the complainant.

*Mr. Andrew J. Whinery,* for the defendant the Bank of Rockville Center Trust Company.

*Mr. Joseph B. Perskie,* for the defendants James F. Mulcahy and the Seaboard National Bank of New York, as guardians.

*Mr. John C. Reed,* for the defendants Marion and Helen Phillips.

*Mr. Edouard L. Dunne,* for the defendant William Welsh, testamentary guardian of Helen Phillips.

*Mr. Frederic M. P. Pearse,* for the defendant National Surety Company.

INGERSOLL, V. C.

On January 16th, 1928, one Francis Phillips entered the banking house of complainant in Atlantic City and deposited the sum of $195,000 and directed that the said amount so deposited should be credited to and in the name of "Helen Francis," and having deposited said sum and the same having been credited as directed on the books of complainant, he, said Francis Phillips, further directed complainant to issue and deliver to him against said credit two certificates of deposit, both payable to the order of bearer, one for the sum of $100,000 and the other for the sum of $95,000, which said certificates of deposit were issued and delivered accordingly. Said certificates have never been presented for payment, both are still outstanding, but in whose hands, custody or possession, complainant is without any knowledge or information whatsoever.

On December 20th, 1926, one Helen Phillips deposited or caused to be deposited in the name and to the credit of said Helen Phillips a sum of money subject to withdrawal by check signed by her. There is now standing in said name of Helen Phillips on the books of complainant, credited to the account of said Helen Phillips, a balance or sum of $29,114.74, which sum is subject to withdrawal as aforesaid.

On June 8th, 1926, one Francis Phillips deposited or caused to be deposited in the name and to the credit of

Francis Phillips, a sum of money, subject to withdrawal by check signed by him. There is now standing in said name of Francis Phillips, on the books of complainant, a credit or balance, withdrawable by check as aforesaid, of $26,646.45.

The government of the United States of America claims a lien upon the moneys so deposited because it alleges that the said moneys were in fact the moneys of one John M. Phillips, father of Helen Phillips and Francis Phillips, and it is alleged by the said government of the United States of America that the said moneys were so deposited to answer some purpose the said John M. Phillips then had in mind and was, in fact, the property of the said John M. Phillips and not the property of either Francis Phillips or Helen Phillips, but of which facts, purpose or the reason therefor, complainant had no knowledge or information prior to or at the time of the acceptance of said deposits, and is yet ignorant thereof, save as informed.

On or about July 3d, 1928, as complainant is informed and believes and therefore alleges as a fact, said John M. Phillips died, leaving a will duly executed and leaving him surviving his widow, Marion Phillips, and two children, a son named Francis and a daughter, Helen, both of whom were infants under the age of twenty-one years, as his next of kin. In and by his said will he named and appointed one John E. Turner guardian of his said minor son, Francis Phillips, and William Welsh and Andrew J. S. Caplis guardians of Helen Phillips, his said minor daughter.

Following the death of his father, the said John M. Phillips, and on or about June 26th, 1929, complainant is informed and believes and therefore alleges as a fact, the said Francis Phillips died intestate, leaving a widow, Helen Phillips, and one child, Helen Frances Phillips, as his next of kin surviving. The said Helen Phillips, widow, and the said Helen Frances Phillips, child of said Francis Phillips, are both infants under the age of twenty-one years.

On or about March 26th, 1928, complainant was notified by written notice signed by Warren G. Price, collector of

internal revenue of the first collection district of the State of New York, of a levy and lien upon all bank deposits and accounts of property in the name of John M. Phillips, Marion Phillips, Francis Phillips and Helen Phillips and other persons, to satisfy a claim of the United States against said John M. Phillips in the sum of $1,376,134.89 for income tax due from him for the years 1923 to 1926, both years inclusive, warning complainant not to allow any of said deposits or accounts to be withdrawn by any person without the authorization of said collector, and complainant has, on divers occasions between said date and August 1st, 1929, been repeatedly warned by said collector of internal revenue not to pay out any of said moneys to any of said persons, and has been ordered to pay over said moneys to John E. Brady, chief field deputy of internal revenue, as the money of and belonging to the said John M. Phillips, in part satisfaction of said claim of the United States of America.

One E. L. Sturgess, collector of internal revenue of the first district of New Jersey, claims as such to be entitled to receive said funds deposited as aforesaid, insisting that the same belonged to said John M. Phillips in his lifetime, and that he is entitled to receive and apply the same on account of payment of said sum due for income tax as aforesaid.

The Bank of Rockville Center Trust Company, a corporation of the State of New York, claims to be entitled to receive said moneys, or some part thereof, as administrator *cum testamento annexo* of John M. Phillips, deceased, and has demanded payment thereof and notified complainant not to pay the same to any other than it, said claimant administrator.

The only dispute concerning the deposit of $29,114.74, made by Helen Phillips, is the claim of the government of the United States, over which this court has no jurisdiction; nor is there any dispute concerning the sum of $26,646.45 deposited in the name of Francis Phillips, save that of the government of the United States, over which this court has no jurisdiction.

The facts concerning the certificates of deposit, as testified to, were as follows:

Mr. Core, the vice-president of the Bankers Trust Company, testified that he saw the said $195,000 handed by Francis Phillips to Senator Emerson L. Richards, president of the Bankers Trust Company, who handed it to the witness, who, after receiving it, counted it and found it to be $195,000, and that the said certificates, which had already been written by him, were handed to Senator Richards and that they thereafter came into the possession of Francis Phillips, and that the said Francis Phillips presented one of the said certificates, the one for $95,000, for payment, each of which said certificates of deposit were in form as follows:

"$100,000          Bankers Trust Company          January 16, 1928
                        Atlantic City, N. J.
   Helen Francis has deposited in this bank one hundred thousand dollars, payable to the order of Bearer on the return of this certificate properly endorsed, with interest at four per cent. per annum, if left one month.
                                                  OLIVER C. CORE,
No. 164.                                                V. P."

The records of the bank show that said certificates No. 164 and No. 165 are still outstanding. It was stipulated and agreed between all the parties "that all parties are properly represented without formal proof."

Mr. Core's testimony is: "My recollection of it is as I told you before, that Francis Phillips took it [the money] out of his overcoat pocket and handed it to Senator Richards and he in turn handed it to me."

Mrs. Marion Phillips Cassidy testified that certificates No. 164 and No. 165 came into her possession about the last of January, 1928, she having given a consideration to her husband, John M. Phillips, for the same, and that she had them in her possession until sometime in January, 1929, when she was in the Harbor Sanitarium having them "in a wallet, a very small pocketbook that I carried in an overnight bag and I always kept them with me," and on the 18th day of January, 1929, she showed them to Mr. Bolich, who she believed to be one of the secret service of the United States government, who called upon her, demanded to see them,

and made a copy thereof. Upon her leaving the hospital, she went to the Bank of Rockville Center in Long Island and placed them in her vault. This occurred on January 26th, 1929. After her return from Miami in the beginning of April, she went to her deposit box "to look over a lot of papers I had and I wanted to destroy some of them." On that occasion she had two safe deposit boxes and "went into my vault and sat down and opened it and took it out into a little room and I started destroying a lot of papers and then I locked up the vault and I went out." Around the 15th of April she returned to the vault and looked in the box and found these certificates were gone. She, in her defense, claimed the ownership of the certificates and the funds that are to be paid out upon their presentation and endorsement, and declared she had no secret agreement of trust with anyone with relation to either two certificates or the amount due on them. She testified that in September, 1928, she gave the certificate for $95,000 to Francis Phillips, who afterwards returned it to her. On cross-examination she was asked: "Do you want the court to believe from what you said that you perchance destroyed these two certificates of deposit? Yes, I do."

Daniel A. Bolich, who at the time of giving the testimony, was internal revenue agent in charge at Philadelphia, but who, from 1924 to 1930 was special agent of the treasury intelligence service, an agent of the United States treasury department, located in New York city. Acting upon information he had received as a government agent, he called upon Marion Phillips Cassidy at the Harbor Sanitarium, New York, in January, 1929, and examined certificates No. 164 and No. 165 of the Bankers Trust Company, one for $100,000 and one for $95,000, which certificates were produced by Mrs. Phillips "Cassidy." The witness made a copy of certificate No. 164, which was produced for him by Marion Phillips Cassidy. Certificate No. 165 was the same as No. 164 with the exception that it was issued for $95,000. He corroborates Mrs. Cassidy's testimony that Mrs. Cassidy had these certificates in her purse with her at the hospital. The

testimony of the witness as to the information he had received was that Francis Phillips "asked me why I didn't go after the property that his mother had and I asked him specifically what property his mother might have. He told me she had two certificates of deposit that had been purchased at the Bankers Trust Company in Atlantic City by his father. They had been purchased by him for his father and that after the purchase his father told him they had been lost and that he thought they had been lost until a short time before when his mother had requested him to cash one of these certificates at the Bankers Trust Company and he was suggesting that the government might well go after those certificates."

Senator Richards, the president of the Bankers Trust Company, testified that he had two or more conversations with John M. Phillips, in one of which "he asked me what he was going to do, that the certificates had been stolen." In the second interview, in response to a call by Senator Richards, asking if he, Phillips, had heard anything further of the certificates, he, Phillips, said, "not to bother about it any further, that his wife had them, that he had to give them to her." Upon cross-examination by Mr. Perskie upon an inquiry to give the entire conversation, Senator Richards said: "I called him at the Ambassador Hotel Cottage where Francis and he lived, so far as I know, I don't know about his wife living there, and asked him if he had any further news concerning the certificates, we were very anxious, $195,000 worth of apparently stolen certificates made to cash out, and he said 'oh, don't bother about that any more.' He said, 'that bitch has got them' using the word—I may say that I had never had any conversation with Mr. Phillips that was not interspersed with the vilest kind of profanity. I asked him who he meant and he says 'my wife,' and then went on to say that he had had to give them to her."

Senator Richards' description of the transaction concerning the two certificates of deposit aggregating $195,000, issued by the Bankers Trust Company, was as follows:

"*A.* John M. Phillips called at my office in the Guarantee

Trust Building and the conversation, near as I can repeat it, like this, he says, 'how much money will you pay over there at the bank on a deposit?' I told him that the clearing house rules permitted the payment of three per cent. interest on accounts over $25,000. He said, 'well, that isn't enough.' He says, 'I want to get more than that.' I said, 'well, Mr. Phillips, there is no way you can get more than that on deposit, but you can take a certificate of deposit out which draws four per cent. interest if you wish to do that.' He then said, 'well, Francis and I will be up to see you,' and I said, 'well, very well, I will see you over at the bank,' and I went over to the bank and Francis came in with his father. In the meantime the new bank building had been opened so that this transaction now took place in the new building. Walked back into what is my private office, which is pretty well back in the bank, and Mr. Phillips then said to me, he said 'the boy is carrying around a lot of money here.' He said, 'I don't want him to have it on him and besides it ought to be earning interest.' He said, 'he has got to learn to take care of his money' and he said 'now,' he said, 'I want you to fix this up so he will be getting interest.' Well, I said you mean—I think he then said to me, as I recall it, 'what is this certificate of deposit?' I said, 'it is merely a certificate.' I think he said, 'what is this paper you talked about?' the words he asked. I said 'a certificate of deposit simply is a statement that the bank holds for the holder of the certificate that much money and it draws four per cent. interest.' He said, 'well,' he said, 'that is all right,' and he says, 'come on kid, give the senator your money,' and then for the first time Francis opened his mouth. He had been sitting there in a sullen sillence. He says, 'I won't do it,' and his father, with considerable profanity said he would, and he suddenly and stubbornly refused and then finally he said to his father, he said, 'you know somebody else knows about this,' and his father says, 'oh, I don't give a damn about that.' He said, 'you do what the senator tells you. You give him your money,' and then Francis said, 'well, all right,' and to my utter astonishment Francis dug down in

his overcoat pocket and fished up $195,000 in currency and
handed it over, laid there on the table. I ran over it, saw
there was $195,000, called Mr. Core and I suppose, for the
benefit of the record you have got to understand that there
is nothing but glass above the counter height in the bank,
so you can see from one length of the bank to the other. Mr.
Core saw him in there and, incidently, almost outside of the
swinging door that separated my office from the banking
room proper. I called to him and he came in and I told him
to make out a certificate of deposit for the $195,000. Then
Mr. Phillips broke in and he says 'make that in two cer-
tificates, one for a hundred thousand'——

"Mr. Whinery—Which Mr. Phillips? A. Senior. 'Make
that two certificates, one for a hundred thousand and one
for ninety-five thousand.' Q. Did he indicate why? Did
he say why? A. Yes. He said 'half of this belongs to his
sister.' Q. Referring to whose sister? A. He indicated,
nodded toward Francis. Q. That is Helen Phillips? A.
Yes. So Mr. Core then asked them how they wanted the
certificates made out and evidently neither of the Phillips'
wanted to discuss the matter in front of Mr. Core at all, so
I told Mr. Core that I would let him know in a minute or two,
to start making out the certificates, and that is when and why
he left the room. He started to make out the certificates,
at least, started to have the proper clerk in the bank make
them out and I talked to the two of them together and I don't
recall which one of the two but the suggestion was made that
they combine the names of the two children Helen and Fran-
cis, which is, of course, what is on the certificates, 'Helen
Francis' and that was done and Mr. Core brought the cer-
tificates back. They lay there on the desk a minute or two
while I chatted with Mr. Phillips and then Francis picked
the two certificates up and proceeded to put them in his
pocket, in his trouser pocket, and I said, 'oh, hold on here,
Francis.' I said, 'you might just as well keep the money in
your pocket instead of going through this performance if
you are going to leave those two certificates in your pocket
or carry them around in your pocket;' I guess I said, and

Mr. Phillips said, 'that is right.' He says, 'here, you give them to the senator to keep.' I says, 'oh, no, not me.' So then the boy says, 'well,' he says, 'there you go,' something like that, evidently referring back again to the argument— I have forgotten; I better go back and detail this—at the time of Francis' first refusal to give up the money, figuring it was a family fight, I stepped out for two or three minutes until they adjusted that and then came back again and then is when he said to him, 'go ahead and do what the senator says, give him the money.' So after Francis said, 'there, I told you so,' I said to them, I said, 'what you want to do is keep them in a safe place.' I said, 'look here, when you were in here originally, you wanted a safe deposit box. Now,' I said, 'why don't you go back'—having then a new vault constructed in the meantime—'go back and get a box in the vault and put them in that?' So they agreed and the two of them went out of my office and up the short flight of steps to the vault grille and they were admitted by the young lady there and she took charge of them from there.. I didn't see what went on in the vault, but they came out in a few minutes and said, 'good-bye,' and went on."

Senator Richards explained that when the certificate of $95,000 was produced, it was not paid because the government had filed a lien against John M. Phillips and "that it was very broad in its scope and I was afraid that it might cover these two certificates and that until the matter was settled with the government I wouldn't cash the certificates," and that at the time of the hearing the lien had not been removed. At that time Francis, who tried to cash the $95,000 certificate, said, "it wasn't his." He said, "it was his mother's."

First clause, section 9 of the Uniform Negotiable Instruments law (*P. L. 1902 p. 583; 3 Comp. Stat. p. 3736*) reads: "The instrument is payable to bearer when it is expressed to be so payable." The instrument in question was so expressed.

The brief of the Chase National Bank, administrator, calls attention to the wording of section 30 (*P. L. 1902 p. 589; 3 Comp. Stat. p. 3738*): "An instrument is nego-

tiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof; if payable to bearer it is negotiated by delivery; if payable to order it is negotiated by the endorsement of the holder completed by delivery," and cites *American National Bank* v. *Kerley, 109 Ore. 155; 220 Pac. Rep. 116; 32 A. L. R. 262*, and quotes from page 278 as follows: "The word 'bearer' alone and of itself, meets the requirements of certainty as to the payee. The word 'bearer' means the person in possession of the bill or note; and when, therefore, a note payable to a payee designated as 'bearer' is issued to a person, whether natural or artificial, it is in truth delivered to a person in being who is ascertained at the time of issue. *Ogden Neg. Inst. No. 52; 8 C. J. 172.* Under the law merchant the word 'bearer' measured up to the requirements of the general rule of certainty; and the law recognized the word 'bearer' as a term of certainty as to the payee. It was not necessary under the law merchant to designate a person by his name, but it was sufficient if, from the language used, the person could be ascertained," and contends that by virtue thereof these certificates of deposit were required to be endorsed before they were negotiable. This contention is incorrect. The only endorsement required to make the same payable is that which the bank is entitled to demand when delivering the money to the bearer. I am unable to find any case or any claim that a check payable to the order of bearer or cash requires the endorsement of every transferee to make it negotiable.

The testimony is undisputed that said certificates of deposit have either been lost or destroyed. The bank therefore is entitled to be indemnified. *Clinton National Bank* v. *Stiger, 67 N. J. Eq. 522.* The result is—that until the liens which have been filed against these sums of money by the United States government shall have been released, no order can be made by this court which could become immediately enforceable. Upon such release or discharge of said liens by the United States government, the said sum of $29,114.74 shall be paid to Helen Phillips or her legal representatives;

214

that the sum of $26,646.45 deposited by Francis Phillips shall be paid to the legal representatives of the said Francis Phillips; that the amount of the said certificates of deposit shall be paid to Marion Phillips Cassidy (the said Marion Phillips having married one Dr. Thomas M. Cassidy) upon the giving by her of a suitable bond indemnifying the said Bankers Trust Company, sufficient in form and surety to protect the said Bankers Trust Company, the complainant, from loss in the event of a future presentation of said certificates.